# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2185-17T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

C.S.

     Defendant-Appellant/
     Cross-Respondent,

and

W.S.,

     Defendant-Respondent/
     Cross-Appellant.

_____

IN THE MATTER OF I.S.,

     a Minor.

_____

Submitted March 6, 2019 – Decided April 4, 2019

Before Judges Koblitz, Currier and Mayer.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, No. FN-12-0234-15.

Joseph E. Krakora, Public Defender, attorney for appellant/cross-respondent (Kevin G. Byrnes, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for respondent/cross-appellant (Arthur D. Malkin, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Christina A. Duclos, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (David B. Valentin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant C.S.[1] appeals from a March 22, 2016 order, finding her guilty of child abuse or neglect, N.J.S.A. 9:6-8.21(c), after a six-day plenary hearing. The family court's finding stemmed from an incident where C.S.'s then-six-year-old daughter, I.S., ate a tube of maximum strength Orajel, a toothache pain reliever, which has the active ingredient benzocaine, and went into cardiac arrest. C.S. performed Cardiopulmonary Resuscitation (CPR) while her adult

---

[1] We use initials to maintain confidentiality. R. 1:38-3(d)(12).

daughter called 9-1-1. The child was not able to breathe on her own until she reached the hospital. After reviewing the record in light of the contentions advanced on appeal, we affirm.

C.S. argues that because she did not intentionally cause I.S. to eat the Orajel, she did not abuse or neglect I.S. The family court found that C.S. failed to exercise a minimum degree of care, based on the condition of C.S.'s home, her prior awareness that I.S. ate non-food items, and her decision to keep Xanax and Orajel in a cabinet accessible to I.S. C.S. also recklessly disregarded I.S.'s safety by allowing her home to fall into a deplorable condition. Division of Child Protection and Permanency (Division) caseworkers testified that the home smelled of body odor, urine, and cigarette smoke. Clutter was everywhere, stacked five-feet high; dirty dishes were in the sink; the floors were sticky; stagnant dark water had filled the bathtub and toilet; cigarette butts were found in a child's playhouse; and flies were everywhere. An empty maximum-strength tube of Orajel was found by I.S.'s bed.

I.S.'s father, defendant W.S., appeals from the family court's December 6, 2017 order terminating the abuse or neglect litigation and returning I.S. to the legal custody of both parents and primary physical custody of her mother, at the request of the Division. We affirm.

The Division, the law guardian, and C.S. all agreed to terminate the litigation because I.S. had been safely returned to her mother's custody. W.S. argues that the family court erred in dismissing the matter without considering his pro se motions for parenting time and custody. At the termination hearing, the family court spoke extensively with W.S., explaining that in the future W.S. could bring motions for visitation and custody under the domestic violence docket number.

At the beginning of this litigation, W.S. had not been in contact with then-six-year-old I.S. for the preceding three years. He contested paternity, and I.S. did not know he was her father. W.S. stated on the record that he was filing motions "to punish" C.S. The family court initially told W.S. he could not have visitation with I.S. until he took a paternity test. W.S. refused to take the paternity test for over one year. W.S. also resisted a psychological evaluation. After W.S. was determined to be I.S.'s father, the family court granted W.S. supervised parenting time, even when I.S. later stated she did not want to see W.S.

As a result of deplorable conditions in the home, the Division first removed I.S. in 2010, returned the child to her mother in 2011, removed her again later in 2011, and returned her in 2012. When the Division filed its

A-2185-17T1

complaint for custody of I.S. on March 22, 2015, a final restraining order was in place between C.S. and W.S.

During the early hours of March 22, 2015, Division caseworker Rita Pardo reported to the Robert Wood Johnson Hospital where I.S. was in the Pediatric Intensive Care Unit. C.S. told Pardo that she and I.S. usually slept in separate beds in one room. That night, I.S. had asked C.S. if she could sleep with her because she was cold. C.S. woke to I.S. vomiting in the bed. When C.S. saw that I.S. was struggling to breathe, she told her adult daughter to call 9-1-1 while C.S. administered CPR. Emergency Medical Technicians spent approximately thirty minutes stabilizing I.S. The child began breathing on her own when she arrived at the hospital. I.S. was ultimately diagnosed with respiratory failure and severe methemoglobinemia[2] due to Orajel ingestion.

C.S. reported that toiletries were kept in a hall cabinet that was accessible to I.S. C.S. believed I.S. took the Orajel after C.S. and her adult daughter fell asleep. C.S. also reported that I.S. was "mischievous" and a "handful." She stated that I.S. "wander[ed] the house" and, in the past, had clogged the bathtub

---

[2] The Division's expert, Dr. Gladibel Medina, testified that this condition affects the body's ability to access oxygen, akin "to not breathing at all." The child required intubation.

A-2185-17T1

and sprayed shaving cream in the bathroom after C.S. fell asleep. C.S. also acknowledged that I.S. had previously tried to eat toothpaste.

I.S. was treated in the hospital with medication and blood transfusions. C.S. told hospital staff that I.S. had a history of exploring the house and chewing or eating objects like erasers and crayons, though there was never a formal diagnosis of pica, the ingestion of non-food items. During her hospital stay, "foreign bodies" were found in I.S.'s stool, which C.S. attributed to I.S.'s habit of chewing on "whatever she [could] find."

Pardo conducted a home inspection, finding "deplorable" conditions.[3] The Division took custody of I.S., who said she "swallowed the stuff that numbs your teeth while her mom was sleeping," the house was messy, the flies used to be her friends, and she did not bathe often.

Dr. Medina testified as the Division's expert in pediatrics and child abuse pediatrics. Dr. Medina testified that I.S.'s ingestion of benzocaine, the active ingredient in Orajel, would have been lethal without medical intervention, and this injury to the child was preventable. Dr. Medina's opinion was based on the following: (1) C.S. knew I.S. wandered around the house when C.S. fell asleep;

---

[3] Photographs from the home inspection were admitted into evidence and considered by the family court.

A-2185-17T1

(2) C.S. described I.S. as mischievous and a handful; (3) C.S. told hospital staff that I.S. ate non-food items like erasers and pencils; and (4) in Dr. Medina's opinion, potentially dangerous items should not have been within six-year-old I.S.'s reach.

Dr. Zhongxue Hua testified as C.S.'s expert in pathology and toxicology. Dr. Hua opined that the incident was an accident, and he did not agree that it was preventable. The family court ultimately found Dr. Hua less credible and persuasive than Dr. Medina because Dr. Medina appeared more familiar with the case records.

The family court noted the facts were not in dispute because C.S. did not testify. The family court found the Division proved, by a preponderance of the evidence, that C.S. failed to exercise a minimum degree of care in two respects: by creating an unhealthy living environment and providing inadequate supervision. The court found that "[I.S.] suffered harm as the result of [C.S.'s] failure to exercise a minimum degree of care. Her conduct was grossly negligent in allowing this home to get to the point that this [c]ourt finds is unsanitary and deplorable and unsafe."

On December 6, 2017, the Division moved to terminate the litigation because "no child safety concerns" remained. C.S. had custody before the abuse

or neglect case began and custody was returned to her. The Division noted that although I.S. stated she did not wish to see her father, the Division would "administratively" establish "some type of family counseling" and supervised visitation would continue. The law guardian and C.S. both agreed to termination of the litigation.

## I. Fact-finding

We defer to the family court's factual findings in an abuse or neglect proceeding because the family court "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010) (quoting N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)).

We must also defer to the family court's credibility determinations. Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). We generally defer to a family court's decision unless it "went so wide of the mark that a mistake must have made." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of North America, Inc., 233 N.J. Super. 65, 69 (1989)).

A child under eighteen years old is abused or neglected if that child's

physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his [or her] parent . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm . . . .

[N.J.S.A. 9:6-8.21(c)(4).]

In an abuse or neglect proceeding, the question of "[w]hether a parent exercised a minimum degree of care must 'be analyzed in light of the dangers and risks associated with the situation.'" N.J. Div. of Child Prot. & Permanency v. Y.N., 220 N.J. 165, 184 (2014) (quoting G.S. v. Dep't of Human Servs., 157 N.J. 161, 181-82 (1999)).

Our Supreme Court has found that the minimum degree of care standard "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S., 157 N.J. at 178. A parent fails to exercise a minimum degree of care when "he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Ibid. at 181. We defer to the family court's detailed findings, well-supported by the record, substantiating neglect.

9

C.S. argues that an expert opinion as to whether the harm to the child was foreseeable, and therefore preventable, exceeds the scope of the witness's expertise. The court listened to opposing experts on this topic. C.S. presented her defense expert's opinion that the harm was not foreseeable, and therefore not preventable. Her belated objection, for the first time on appeal, after her expert lost the credibility contest between the opposing experts, constitutes invited error. M.C. III, 201 N.J. at 340 ("The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error.") (quoting Brett v. Great Am. Recreation, 144 N.J. 479, 503 (1996)).

## II. Dismissal of Litigation.

We review a family court's legal conclusions in an abuse or neglect case de novo. N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 156 (App. Div. 2018). After the family court concludes that a child is abused or neglected, it must hold a dispositional hearing. N.J. Div. of Youth & Family Servs. v. T.S., 426 N.J. Super. 54, 63 (App. Div. 2012). During the abuse or neglect fact-finding hearing, "only competent, material and relevant evidence may be admitted." N.J.S.A. 9:6-8.46(b)(2). During the dispositional hearing,

A-2185-17T1

however, "material and relevant evidence may be admitted," even if not competent. N.J.S.A. 9:6-8.46(c).

Our Supreme Court has held that "the statutory framework of Title Nine provides that upon a finding of abuse and neglect, the offending parent or guardian is entitled to a dispositional hearing to determine whether the children may safely return to his or her custody, and if not, what the proper disposition should be." N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 387-88 (2009). "At the dispositional hearing, both sides may present material and relevant evidence for the court to determine whether the children may safely be released to the custody of their mother, who was responsible for their care at the time of the filing of the complaint, or whether, consistent with N.J.S.A. 9:6–8.51, some other disposition is appropriate." Id. at 402. Here, I.S. was returned to her caretaker.

The family court sufficiently addressed W.S.'s motions. W.S. delayed more than a year before taking the ordered paternity test. His psychological evaluation found significant concerns concerning his impulse control and violent behavior. He had only recently begun to engage in therapy. The court returned joint legal custody to both parents and continued W.S.'s supervised parenting time. W.S. chose to litigate without an attorney for most of this

matter. He may continue to do so and present his motions in the domestic violence docket.

The family court addressed this family's issues in a fact-based and sensitive manner. The court's findings were thorough and based on substantial evidence in the record. It rendered a detailed oral opinion finding abuse or neglect. Similarly, the family court detailed on the record why it was terminating the litigation despite W.S.'s objection. We affirm substantially for the reasons expressed by the family court.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2185-17T1